## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**MARION P. HAMMER,**
**an individual and Florida resident,**

     **Plaintiff,**

**vs.**                                                       **CASE NO.:**

**NATIONAL RIFLE ASSOCIATION OF AMERICA,**
**a New York company,**

     **Defendant.**
_____/

### VERIFIED COMPLAINT FOR DAMAGES AND
### DEMAND FOR JURY TRIAL

Plaintiff, Marion P. Hammer ("Plaintiff" or "Marion Hammer"), sues Defendant, the National Rifle Association of America ("NRA"), and alleges as follows:

### Introduction

1.    Marion Hammer has given her entire working life to the NRA. Time and again, she was called upon to fearlessly defend the NRA and Second Amendment rights, while enduring the wrath of NRA opponents and vigilantes who repeatedly tried to intimidate her and force her disassociation from the NRA and its mission.

2.     Over time, Plaintiff became the female face of the NRA which, in turn, relied on Plaintiff's association and efforts, particularly with respect to its outreach to women.  Her lifetime efforts have been recognized by the NRA which has bestowed the "Marion P. Hammer Woman of Distinction Award" to over twenty (20) female recipients since 2005.  To this day, the NRA's website proudly displays her image and the list of award recipients: https://awards.nra.org/marion-p-hammer-woman-of-distinction-award/.

3.     Now, after giving the fruits of her life's labor to the NRA, she has been abandoned by the very association she so fearlessly defended.  Instead of honoring its commitments to her, the NRA has turned its back upon its namesake Woman of Distinction, breached its final contract with her and attempted to smear her impeccable reputation.  Most recently, in continuation of its retaliatory campaign, the NRA is actively seeking to remove Marion Hammer from the NRA's Executive Council and extinguish her membership in the NRA, as if she never existed.

4.     As she has her entire life, Marion Hammer will now vindicate her rights.

## Nature of the Actions

5.    Plaintiff now brings an action for damages arising from the Defendant NRA's unlawful breach of Plaintiff's long-standing, fair, reasonable and enforceable contract with the NRA.

6.    In addition, Plaintiff brings actions to recover for the statutory violations and unjust enrichment of the NRA arising from its continued and unlawful use of Plaintiff's name, image and likeness as part of the NRA's targeted attempt to increase its membership, particularly as it relates to women. Finally, because the NRA solicited contributions from the Plaintiff (and potentially others) under intentionally false pretenses, Plaintiff brings claims for fraudulent misrepresentation, conversion and violations of Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA").

## Jurisdiction

7.    This is a civil action in which the amount in controversy exceeds $75,000.00, exclusive of interest, attorney's fees and costs.

8.    Plaintiff is an individual residing in Tallahassee, Florida.

9.    Defendant NRA was incorporated in New York and has its principal place of business in Fairfax, Virginia.  NRA is thus a citizen of New York and Virginia for purposes of diversity jurisdiction pursuant to 28 U.S.C. § 1332(c)(1).

10.    This district court accordingly has complete diversity and subject matter jurisdiction over the instant dispute pursuant to 28 U.S.C. § 1332.

## Venue

11.    The NRA is authorized to (and does) transact business in the state of Florida, where it maintains a registered agent and where it actively solicits contributions from countless Floridians.  The NRA's solicitation of the Plaintiff occurred in this district and the NRA's unlawful use of Plaintiff's name, image and likeness has occurred throughout Florida and in this district, where the NRA actively advocates before the Florida Legislature.  Finally, the NRA's unlawful termination of Plaintiff's Contract occurred in this district, where the NRA contacted the Plaintiff and informed her that the Contract was being immediately terminated.

12.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this dispute occurred in this judicial district.

## General Allegations

13.    There is simply no dispute that Plaintiff has enjoyed a long and distinguished personal and professional relationship with the NRA for at least forty-five (45) years.

14.    During that time, Plaintiff has received numerous accolades and awards from the NRA for her relentless pursuit of NRA's goals across the United States.

4

15.    In 1995, Plaintiff became the first female President of the NRA where she served with distinction and successfully led the NRA.

16.    Marion Hammer has devoted her entire professional career to selflessly and loyally advancing the interests of the NRA, and repelling attacks from groups adverse to the interests of the NRA.  A review of the public domain reveals countless accolades extolling her efforts on behalf of the NRA and its interests.

17.    The NRA will not deny these unassailable facts.  Instead, it admits them.

18.    On its website, the NRA describes her as:

Marion became a lobbyist during the 1970's and works with the Florida legislature to write pro-gun legislation.  She is credited with influencing many of Florida's gun laws including the 2005 Stand Your Ground law. The success of her pro-gun lobby has had an impact on similar laws *across* the United States. Marion began to develop the NRA Eddie Eagle GunSafe program for children in 1988. To date, over 28 million children have completed this very successful program.

*See* https://awards.nra.org/awards/marion-p-hammer-woman-of-distinction-award/marion-p-hammer/ (last accessed April 3, 2025)

19.    As correctly proclaimed by the NRA, Ms. Hammer's efforts have had a nationwide impact in advancing the interests of the NRA. The NRA has stated:

Marion is a trailblazer, a leader and an outspoken activist and leader. She is a staunch defender and protector of our Second Amendment right to keep and bear arms. We celebrate her achievements and are inspired by her extraordinary life of service.

5

*Id.*

## Marion Hammer's 2017 Contract With NRA

20.    In December of 2017, Plaintiff and the NRA executed a one-year contract (the "Contract") which outlined the services Plaintiff would provide to the NRA as part of its efforts to protect the Second Amendment across the United States.[1]

21.    A true and correct copy of this Contract is attached hereto as Exhibit A.

22.    The Contract is a valid and binding agreement between the NRA and Plaintiff.

23.    Pursuant to the Contract, Plaintiff was to "perform services in the form of advice, analysis and other duties reasonably assigned by the Executive Vice President of the NRA and Executive Director/ILA including providing information, advice and counsel on legislation, initiative, referenda, election, communication and media matters and other work related services *as may be requested by the NRA* or NRA/ILA." *Contract*, ¶1.

24.    By operation of the Contract, Plaintiff was thus retained by the NRA to perform work as assigned and requested.

---

[1] The Contract was separate and apart from Plaintiff's arrangement with the Unified Sportsmen of Florida, an NRA affiliate that operated exclusively in Florida.

25.    In addition, however, the Contract bestowed the NRA with the right to restrain Plaintiff from other engagements because, after all, Plaintiff had been so closely aligned and assimilated with the NRA for many, many years.

26.    So while the Contract noted that Plaintiff could consult "with other clients," Plaintiff could not "accept, without prior approval from NRA, any such engagement." *Contract*, ¶4B.

## Hammer Is Solicited By NRA Opponents

27.    In 2018, Plaintiff was contacted by an attorney representing the Brady gun control group.  The group offered five million dollars ($5,000,000) to Plaintiff if she would retire and cease advancing the interests of the NRA and defending the Second Amendment.

28.    At that time, Plaintiff relayed the offer her direct report at the NRA: Mr.  Wayne LaPierre, NRA Executive Vice President.

29.    After contemplating the information relayed by Plaintiff, Mr. LaPierre contacted Plaintiff the very next day.

30.    Mr. LaPierre informed Plaintiff that he, along with NRA Treasurer Woody Phillips and NRA Chief of Staff Josh Powell, had developed a proposal that would assure Plaintiff's continued involvement in the NRA through a consulting arrangement, while funding a retirement for her future.

7

31.    Although the new proposal would pay less than half the offer from the Brady group, the proposal would allow Plaintiff continue working with the NRA for years to come.

32.    Under this new proposal, Plaintiff's Contract would be extended for an additional ten (10) years and she could continue consulting on important Second Amendment issues nationally, putting her in a position to ultimately retire from the national scene.  Most importantly, however, the NRA would continue to control Plaintiff's "other engagements" and assure itself that Plaintiff would never be aligned with the opposition.

33.    Plaintiff reasonably relied upon these representations and decided to forgo her other opportunities, while remaining on the side of the NRA.

34.    As a result, Plaintiff and the NRA executed a ten (10) year extension of the Contract in the form of an Addendum.

35.    A true and correct copy of the Addendum is attached hereto as Exhibit B.

36.    Although Marion Hammer provided years of valuable service to the NRA, she was never included in the NRA's retirement plan. The Contract and the Addendum were in recognition of her dedicated service and to assist her in

transitioning at the end of the Contract term from dedicated NRA service to private life.

37.    The Addendum thus provided for Marion Hammer's continued services nationwide on behalf of the NRA by being available as a resource to provide guidance on issues and was unrelated to any duties Ms. Hammer performed in the state of Florida.

38.    The Addendum provided that Marion Hammer's original contract was amended to provide for a ten (10) year term, together with a reasonable increase in the payment terms in the Contract.  The Addendum continued to require Marion Hammer to not undertake any activities adverse to the NRA. In essence, a valuable non-compete arrangement was formed.

39.    Due to its importance, the Addendum was discussed and ratified by NRA Board's Audit Committee during its meetings held September 8 – 9, 2018. Specifically, the Audit Committee, with NRA counsel present and advising, found that:

> WHEREAS, due to her unique experience and celebrated accomplishments over decades of service as a lobbyist for Second Amendment rights in Florida, the NRA has for several years engaged one of its directors, Marion Hammer, as a consultant; and

9

> WHEREAS, the NRA and the Audit Committee have determined that no other available individual possesses comparable knowledge and competencies in Ms. Hammer's field; and
>
> WHEREAS, the NRA had determined that an increase in Ms. Hammer's annual consulting fee from $168,000 to $220,000 is therefore appropriate, and the Audit Committee concurs that such and increase is fair, reasonable, and in the best interest of the NRA; now, therefore, be it
>
> RESOLVED that the foregoing increase is hereby approved and ratified. The Committee further notices that any material change in the terms of the contract, or duties under the contract, shall be disclosed to the Committee and approved prior to execution.

40.     In this way, Mr. Wayne LaPierre, the Executive Vice President, in conjunction with the NRA Board Audit Committee, recognized the unique skills Marion Hammer brought to bear nationally on behalf of the NRA.[2]

41.     Since the inception of the Contract, Marion Hammer has fulfilled her contractual obligations by being an invaluable resource and providing respected guidance to persons representing the NRA across the nation. She has also been a well-respected spokesperson for the interests of the NRA. She has forgone engagements that were in conflict with, or not approved by, the NRA.

42.     Even during this Contract, Plaintiff endured death threats for her continued association with the NRA. As Ms. Hammer stated in 2018:

---

[2] While Mr. LaPierre is no longer an office holder at the NRA, the NRA's counsel recently referred to him as a "visionary" in court proceedings.

10

> The death threats come with the job . . . I've dealt with it for many, many years. But it is so ugly this time NRA is insisting that I listen to my security advisers. It always amazes me how these people who claim to want to stop violence are so quick to threaten violence. I have never been afraid of them but it really makes me angry when they threaten my family.

43.     In 2022, Plaintiff decided to step down from continued lobbying efforts in Florida (unrelated to the Contract).   In announcing Plaintiff's retirement, the NRA stated in pertinent part:

> Marion Hammer is stepping down from her position as a state lobbyist for the NRA-Institute for Legislative Action (ILA) in Florida. She will continue to serve as an advisor to the NRA, assisting with Second Amendment advocacy in the Sunshine State and beyond . . . .  Marion Hammer's name has become synonymous with the Second Amendment and the NRA . . . . I am grateful that Marion will stay on as an advisor to the Association – so our members can continue to benefit from her expertise and defense of their freedoms.

44.     A true and correct copy of the NRA's June 16, 2022, press release is attached hereto as Exhibit C.

45.     The NRA's June 16, 2022, press release aligns exactly with the conversations that Plaintiff had with NRA leadership and the terms of her Addendum.  Marion Hammer would continue to be aligned with the NRA and serve as an advisor for many years to come.

## The NRA Breaches The Contract

46.     On or about April 22, 2024, Mr. Andrew Aarulanandam, on behalf of the NRA, telephoned Plaintiff in Tallahassee, Florida.  Mr. Aarulanandam (then

Executive Vice President) told Plaintiff that the NRA had unilaterally terminated her Contract.

47.    Despite the express conditions of the NRA Board Audit Committee (that any change to Plaintiff's Contract needed to be approved by the Audit Committee), Mr. Aarulanandam informed Plaintiff that the decision to terminate the Contract was his alone.

48.    Although Plaintiff had fully and substantially performed the terms of her Contract, no explanation was given for the NRA's actions.

49.    Since the date of the telephone call, the NRA has withheld lawfully due payments to Ms. Hammer, leaving her with only social security as income.

50.    Even worse, in an effort to manufacture an excuse to avoid its obligations, the NRA now claims to be reviewing the Contract (again) to see whether an excess benefit was given. This so-called review, however, is retrospective and will never cure the NRA's breach or restore the damages which Plaintiff has suffered.

51.    Simply put, the NRA has turned its back on its namesake female pioneer while somehow claiming that an Addendum designed to preserve Plaintiff's name with the NRA's interests (and avoid competing engagements) "could be" an excessive benefit. That is as absurd as it sounds.

### The NRA Continues to Use Plaintiff's Name, Image, and Likeness without Plaintiff's Consent

52.    Since the NRA's breach of the Contract on or about April 22, 2024, the NRA has continued to use Plaintiff's name, image, and likeness without Plaintiff's consent.

53.    Recently, on or about February 8, 2025, the NRA sent an email with a link to an article on the NRA's website, https://www.americas1stfreedom.org/content/after-44-years-of-second-amendment-advocacy-marion-p-hammer-retires/, titled "After 44 Years Of Second Amendment Advocacy, Marion P. Hammer Retires." Below the article heading is a "DONATE" button linked to a donation page for the NRA.

54.    Another webpage on the NRA's website, https://awards.nra.org/awards/marion-p-hammer-woman-of-distinction-award/marion-p-hammer/, is dedicated to honoring Marion P. Hammer. It provides a biographical overview of her life and career, emphasizing her groundbreaking role as the first female president of the NRA, her extensive lobbying work in Florida influencing gun legislation, and her contribution to the Eddie Eagle GunSafe program. The webpage also lists numerous awards and accolades Hammer has received, showcasing her recognition within the NRA and other organizations.

55.     The NRA awarded the "2023 Marion P. Hammer Woman of Distinction Award" and published an online article, https://www.nrawomen.com/content/sharon-callan-receives-2023-marion-p-hammer-woman-of-distinction-award, on or about June 17, 2024, regarding the award. The article features a link where visitors may nominate other women, who are currently NRA members, for the award.

56.     Marion Hammer never consented or agreed to the NRA's continued use of her name, image and likeness, especially with respect to its efforts to raise funds or recruit women to its membership rolls.

## The NRA Defrauds Plaintiff

57.     Aside from these concerns, the NRA also solicited contributions from Marion Hammer under false pretenses.

58.     On or about March 22, 2023, an employee of the NRA, visited Plaintiff at her home in Tallahassee, Florida. The employee asked Plaintiff to make a donation to the Women's Leadership Forum, a part of NRA Foundation, Inc.

59.     Plaintiff provided three checks to the NRA employee on or about March 22, 2023, in the amounts of $2,500.00 ("Check #1409"), $1,000.00 ("Check #1414"), and $1,500.00 ("Check #1423"), intended as a donation to the Women's Leadership Forum under NRA Foundation, Inc.

60.    Plaintiff clearly issued all three checks as a donation to the Women's Leadership Forum under NRA Foundation, Inc., a 501(c)(3) organization.

61.    Donations made to 501(c)(3) tax-exempt organizations are tax deductible.

62.    The NRA deposited Check #1414 for the benefit of and into a bank account owned by NRA Foundation, Inc.

63.    However, the NRA deposited Check #1409 for the benefit of and into a bank account owned by the NRA.

64.    The NRA discarded Check #1423 and has refused to provide additional information regarding its knowledge of what happened to it upon Plaintiff's request.

65.    The NRA is a 501(c)(4) organization.  Donations made to the NRA are not tax deductible.

66.    All conditions precedent to bringing these actions have been waived or satisfied.

## COUNT ONE – BREACH OF CONTRACT

67.    Plaintiff restates the allegations set forth in paragraphs 1 – 51 and 66 above as if fully set forth herein.

68.    The NRA's failure or refusal to pay sums due and owing under the Contract and Addendum is a substantial, material breach of the Contract and Addendum.

69.    As a direct and proximate result of the NRA's breach, Plaintiff has suffered damages, including but not limited to compensation owed, prejudgment interest and her attorney's fees and costs.

WHEREFORE, Plaintiff demands judgment against Defendant NRA for damages, prejudgment interest, attorney's fees, and such other relief as may be necessary and proper.

## COUNT TWO – VIOLATION OF SECTION 540.08, FLORIDA STATUTES (UNAUTHORIZED USE OF NAME, IMAGE AND LIKENESS)

70.    Plaintiff restates the allegations set forth in paragraphs 1 - 56 and 66 above as if fully set forth herein.

71.    This is an action pursuant to section 540.08(2), Florida Statutes, for the unauthorized use by the NRA of Plaintiff's name, image and likeness.

72.    The NRA continues to use Plaintiff's name, image, and likeness without Plaintiff's consent for advertising or commercial purposes.

73.    As a result of the NRA's actions in violation of section 540.08(2), Florida Statutes, Plaintiff has been harmed.  Plaintiff is entitled to recover her damages, including a reasonable royalty.

16

74.    Plaintiff also reserves her right to seek punitive damages pursuant to section 540.08(2), Florida Statutes.

WHEREFORE, Plaintiff demands judgment against Defendant NRA for injunctive relief, damages, prejudgment interest, attorney's fees, and such other relief as may be necessary and proper.

## COUNT THREE – COMMON LAW INVASION OF PRIVACY

75.    Plaintiff restates the allegations set forth in paragraphs 1 - 56 and 66 above as if fully set forth herein.

76.    The NRA continues to use Plaintiff's name, image, and likeness without Plaintiff's consent for advertising or commercial purposes.

77.    The NRA's commercial misappropriation of Plaintiff's likeness constitutes a invasion of Plaintiff's privacy which is actionable under Florida common law.

WHEREFORE, Plaintiff demands judgment against Defendant NRA for damages, prejudgment interest, and such other relief as may be necessary and proper.

## COUNT FIVE – UNJUST ENRICHMENT

78.    Plaintiff restates the allegations set forth in paragraphs 1 – 56 and 66 above as if fully set forth herein.

79.     The NRA continues to utilize Plaintiff's image and likeness, without her consent, in order to aid its recruitment efforts and membership interests.

80.     The NRA has not compensated Plaintiff for the fair value of her name, image and likeness and has thus been unjustly enriched.

81.     It would be inequitable for the NRA to retain its unjustly enriched benefits and not pay fair value to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant NRA for damages, prejudgment interest, and such other relief as may be necessary and proper.

## COUNT SIX – CONVERSION

82.     Plaintiff restates the allegations set forth in paragraphs 1 – 66 and 83 – 86 above as if fully set forth herein.

83.     This is an action for conversion under Florida law.

84.     The NRA received the checks by transfer, other than a negotiation.

85.     The NRA knew the NRA's account was <u>not</u> the proper account to deposit Plaintiff's Check #1409 into as it correctly deposited Check #1414 for the benefit of and into a bank account owned by NRA Foundation, Inc.

86.     The NRA intended for Plaintiff to believe that her donations would be deposited into a bank account owned by NRA Foundation, Inc. because otherwise, Plaintiff would not have provided the NRA with the checks.

18

87.    The NRA was not entitled to deposit Check #1409 for the benefit of and into a bank account owned by the NRA.

88.    As a result of the NRA's actions, Plaintiff has been harmed.

WHEREFORE, Plaintiff demands judgment against Defendant NRA for damages, prejudgment interest, and such other relief as may be necessary and proper.

## COUNT SEVEN–DECEPTIVE AND UNFAIR TRADE PRACTICES

89.    Plaintiff restates the allegations set forth in paragraphs 1 – 66 and 84 – 87 above as if fully set forth herein.

90.    This is an action brought pursuant to the Florida Deceptive and Unfair Trade Practices Act (Chapter 501, Part II).

91.    The NRA continues to use Plaintiff's name, image, and likeness without Plaintiff's consent for advertising or commercial purposes in a manner that falsely suggests that Plaintiff continues to endorse the NRA.

92.    Plaintiff's future business opportunities for endorsement have diminished in value due to the NRA's continued conduct as alleged herein, including its continued and unjustified use of Plaintiff's name, image, and likeness.

93.    The NRA's unauthorized use of Plaintiff's name, image and likeness to solicit donations and increase its female membership is an unconscionable and

deceptive act or practice conducted in trade and commerce and expressly prohibited by section 501.204(1), Florida Statutes.

94.     In addition, the NRA's solicitation of donations, at least from Plaintiff, and its wrongful deposit of funds in the NRA's account was an unfair or deceptive act prohibited by section 501.204(1), Florida Statutes.

95.     As a result of the NRA's actions, Plaintiff has been harmed.

96.     Plaintiff is entitled to recover her damages from the NRA pursuant to section 501.211(2), Florida Statutes.

97.     Plaintiff is entitled to recover her attorney's fees for bringing this action pursuant to section 501.2105, Florida Statutes.

WHEREFORE, Plaintiff demands judgment against Defendant NRA for damages, prejudgment interest, attorney's fees, and such other relief as may be necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues triable by a jury.

RICHARD E. COATES
(TRIAL COUNSEL)
Fla. Bar No. 0930032
E-mail: rcoates@rcoateslaw.com
Secondary E-mail: sgreen@rcoateslaw.com
Coates Law Firm, PL

115 East Park Avenue
Unit 1
Tallahassee, Florida  32301
(850) 681-1029 (phone)
(850) 208-9038 (facsimile)

**COUNSEL FOR PLAINTIFF
MARION P. HAMMER**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**MARION P. HAMMER,**
 a Florida resident,

      **Plaintiff,**

vs.                                **CASE NO.:**

**NATIONAL RIFLE ASSOCIATION OF AMERICA, a**
**New York and Virginia company,**

      **Defendant.**

_____/

## VERIFICATION PURSUANT TO 28 U.S.C. §1746

I, Marion P. Hammer, on behalf of myself hereby verify under penalty of perjury pursuant to 28 U.S.C. §1746 and the laws of the United States of America that the facts set forth in the foregoing Verified Complaint for Damages and Demand for Jury Trial are true and correct to the best of my knowledge.

This 6 day of May 2025.

Marion P. Hammer

22