**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

———————————————————————

MARION P. HAMMER,

    Plaintiff/Counterclaim Defendant,

    v.

THE NATIONAL RIFLE ASSOCIATION
OF AMERICA

    Defendant/Counterclaim Plaintiff.

———————————————————————

Case No.: 1:25-cv-01557-PTG-LRV

**THE NRA'S OPPOSITION TO MARION P. HAMMER'S
MOTION TO DISMISS COUNTS IV, V, AND VII
OF THE AMENDED COUNTERCLAIMS**

Defendant/Counterclaim Plaintiff, The National Rifle Association of America ("the NRA"), in the above-entitled matter, by counsel, submits the following Opposition to Plaintiff/Counterclaim Defendant Marion P. Hammer's ("Ms. Hammer") Motion to Dismiss Counts IV, V, and VII of the NRA's First Amended Counterclaims (the "Motion" or "Mot.") [Dkt. Nos. 51-52]. For the reasons discussed below, the Court should deny the Motion in its entirety.

**I.    Introduction**

Before the Court is Ms. Hammer's motion under Fed. R. Civ. P. 12(b)(6) to dismiss the NRA's claims against her for conspiracy and fraud in the inducement arising from the facts and circumstances surrounding her 2018 Contracting Agreement, and its subsequent Addendum.

Ms. Hammer's Motion fails to establish that any of the NRA's Counterclaims for conspiracy or fraud in the inducement are properly subject to dismissal for failing to state a plausible claim for relief.

By and large, Ms. Hammer merely recites her disagreement with the facts alleged by the NRA. Ms. Hammer then contests those facts and concludes that the disputes created thereon mandate dismissal. This, of course, is not an appropriate basis for dismissal under Rule 12(b)(6). *See, e.g., Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (a court cannot resolve "contests surrounding the facts, the merits of a claim, or the applicability of defenses"). When Ms. Hammer is not contesting the facts of the NRA's Counterclaims, she attempts to inappropriately argue affirmative defenses that cannot be resolved on a motion to dismiss (e.g., the intra-corporate immunity doctrine). None of the grounds advanced in support of Ms. Hammer's Motion has merit or is a cognizable basis for dismissal.

The Court should deny the Motion and permit Counts IV, V, and VII of the NRA's Amended Counterclaims to proceed forward.

## II.    Relevant Factual Background of the NRA's Counterclaims

A.    *The National Rifle Association of America (NRA)*

Founded in 1871, the NRA is the United States' longest-standing civil rights organization. *See* The National Rifle Association of America, About the NRA (available at: https://home.nra.org/about-the-nra/) (last visited on Mar. 10, 2026). With more than three million members, the NRA is dedicated to protecting the Nation's freedoms guaranteed by the Second Amendment to the U.S. Constitution through supporting activities that promote education and safe and responsible firearms ownership. *See id*.

B.    *The National Rifle Association of America (NRA) and the NRA's Board of Directors*

The NRA has adopted bylaws to govern the internal affairs of the organization. Countercl. ¶ 7. Pursuant to its bylaws, the NRA is governed by a Board of Directors who are elected by the NRA's members. Countercl. ¶ 8. The NRA's Board of Directors is tasked with ultimate oversight

and governance of the organization. Countercl. ¶ 9. This includes responsibility for, among other things, ensuring that the organization operates in the best interest of its mission and members. *Id.*

Members of the NRA's Board of Directors are fiduciaries of the organization. Countercl. ¶ 10. As a result, the NRA's directors may not enter into any related party transactions with the organization unless the transaction is determined by the Board of Directors, or an authorized committee of the Board of Directors, to be fair, reasonable, and in the organization's best interest. Countercl. ¶¶ 10-11. The NRA's bylaws provide that "[n]o director or member of the Executive Council shall receive any salary or other private benefit unless specifically authorized by resolution of the Board of Directors or an authorized committee thereof[.]" Countercl. ¶ 12.

The NRA's Board of Directors has dozens of standing and special committees, including an Audit Committee. Countercl. ¶ 13. The Audit Committee's responsibilities include, among other things, evaluating potential conflicts of interest. Countercl. ¶ 14. The Audit Committee reviews all transactions of the organization that involve potential conflicts of interest and determines whether to approve those transactions. Countercl. ¶ 15.

C.     *Marion P. Hammer and Wayne LaPierre*

Ms. Hammer is a well-known Second Amendment advocate in Florida. Countercl. ¶ 17; *accord* Compl. ¶¶ 1, 16. Ms. Hammer is a former member of the NRA's Board of Directors, serving as an elected director of the organization from 1982 through 2024. Countercl. ¶¶ 18, 50.

Wayne LaPierre is the former Executive Vice President of the NRA, a position he held with the organization between 1991 and January 31, 2024. Countercl. ¶ 20. As the NRA's EVP, Mr. LaPierre was responsible for, among other things, directing the affairs of the NRA in accordance with the programs and policies established by the Board of Directors. Countercl. ¶ 21.

Ms. Hammer and Mr. LaPierre maintained a close relationship during their time with the NRA. Countercl. ¶ 23.

    D.    *Ms. Hammer's Contracting Agreements with the NRA from 2004 to 2017*

During her tenure as a member of the NRA's Board of Directors, Ms. Hammer also served as a contractor to the NRA. Countercl. ¶ 24; *accord* Compl. ¶ 20. With respect to entering into agreements with contractors to provide services, the NRA's policy is to retain a contractor when, among other things, existing staff does not have the requisite skills to perform a desired task and the nature of the engagement can be paid by the project, day, or hour. Countercl. ¶ 25. Due to Ms. Hammer's experience and accomplishments as a Second Amendment advocate, the NRA contracted with Ms. Hammer to provide consulting services to the organization beginning in 2004. Countercl. ¶ 26.

Between May 2, 2004, and November 1, 2016, Ms. Hammer entered into ten separate Contracting Agreements with the NRA. Countercl. ¶ 27, Exs. 1-10. Mr. LaPierre executed each of Ms. Hammer's Contracting Agreement on behalf of the NRA. Countercl. Exs. 1-10. In pertinent part, Ms. Hammer's 2004-2017 Contracting Agreements stated that she would "perform services in the form of advice, analysis, and other duties reasonably assigned by the Executive Vice President of the NRA [i.e., Mr. LaPierre] . . . including providing information, advice and counsel on legislation, initiative, referenda, election, communication and media matters and other related services as may be requested by the NRA[.]" Countercl., Exs. 1-10 § 1.

Ms. Hammer's 2004-2017 Contracting Agreements constituted related party transactions with the organization. Countercl. ¶ 31, Exs. 1-10. The NRA's Audit Committee approved Ms. Hammer's 2004-2017 Contracting Agreements, determining that each Contracting Agreement was fair, reasonable, and in the NRA's best interest. Countercl. ¶ 32.

Between May 2, 2004, and December 21, 2017, Ms. Hammer performed under her Contracting Agreements, providing consulting services to the NRA in exchange for payment for the same. Countercl. ¶ 33.

E.    *Ms. Hammer's 2018 Contracting Agreement and Addendum*

On December 22, 2017, Ms. Hammer and Mr. LaPierre executed an eleventh and final Contracting Agreement with the NRA (the "2018 Contracting Agreement"). Countercl. ¶ 34, Ex. 11. Ms. Hammer's 2018 Contracting Agreement was for a one-year term beginning on January 1, 2018, *id*. § 2(A), and provided Ms. Hammer a $168,000.00 fee for consulting services to the NRA, *id*. 3(A). The 2018 Contracting Agreement contained an identical description of the services Ms. Hammer would provide to the NRA as in her 2004-2017 Contracting Agreements. *Compare* Countercl. Exs. 1-10 *with* Ex. 11. And identical to Ms. Hammer's 2004-2017 Contracting Agreements, the 2018 Contracting Agreement constituted a related party transaction as Ms. Hammer continued to serve on the NRA's Board of Directors. Countercl. ¶ 37, Ex. 11.

Approximately four months after Ms. Hammer executed the 2018 Contracting Agreement, Ms. Hammer and Mr. LaPierre executed an Addendum on April 16, 2018. Countercl. ¶ 44, Ex. 13. The Addendum amended the 2018 Contracting Agreement to increase Ms. Hammer's annual fee to $220,000.00 and extend the term of the Contracting Agreement from one to ten years. Countercl. ¶ 47, Ex. 13.

On April 22, 2024, the NRA terminated Ms. Hammer's 2018 Contracting Agreement under Section 2(c). Countercl. ¶ 51, Ex. 11 § 2(c) ("Each party may, in its sole discretion, terminate this Agreement, with or without cause, immediately upon 30 days written notice.").

5

F.       *Ms. Hammer and Mr. LaPierre Conspired to Defraud the NRA and Provide Ms. Hammer with an Excess Benefit Under the Guise of a Contracting Agreement*

After terminating Ms. Hammer's 2018 Contracting Agreement, the NRA learned that Ms. Hammer did not provide any services of value to the NRA between January 1, 2018, and April 22, 2024, under the 2018 Contracting Agreement. Countercl. ¶ 54. The NRA also learned that the reason Ms. Hammer did not provide the organization with any services of value was because the purpose of the 2018 Contracting Agreement, and subsequent Addendum, was not for Ms. Hammer to provide the NRA with any consulting services, but to provide Ms. Hammer with a means for the NRA to compensate her while she provided nothing in return (i.e., an improper excess benefit). Countercl. ¶¶ 55-62; *accord* Compl. ¶¶ 30, 32, 36, 49 (stating that the purpose of the 2018 Contracting Agreement was not to provide consulting services but to recognize her "years of valuable service to the NRA," "assist her in transitioning . . . to private life," and "fund[] a retirement for her future."). Both Ms. Hammer and Mr. LaPierre hid the true purpose of this latest contracting agreement from the NRA; conspiring and devising a plan for Ms. Hammer to obtain a continuous stream of income from the NRA, at the NRA's expense, in exchange for nothing. Countercl. ¶¶ 55-62.

To accomplish this scheme, Ms. Hammer and Mr. LaPierre agreed that they would obtain this continuous income stream for Ms. Hammer under the guise of a "contracting agreement" with the NRA. Countercl. ¶ 58. Because Ms. Hammer had previously entered into multiple contracting agreements with the NRA between 2004 and 2017 during Mr. LaPierre's tenure as the NRA's EVP, a "final" contracting agreement for an extended period between Ms. Hammer and the NRA would draw little scrutiny from the NRA's Audit Committee (i.e., the NRA's body that reviews and approves agreements with contractors). *Id*. This final "contracting agreement" would contain all of the hallmarks, terms, and affirmative representations in Ms. Hammer's previous Contracting

Agreements with the NRA to appear legitimate while omitting its true purpose: to provide Ms. Hammer with retirement funds because she had not participated in the NRA's retirement plan. Countercl. ¶¶ 57, 59; *compare* Ex. 11 *with* Exs. 1-10.

But despite Ms. Hammer's representations regarding the services she would provide to the NRA under this final "contracting agreement," it was understood between Ms. Hammer and Mr. LaPierre that Ms. Hammer would not, in fact, provide any services to the Organization through the contract's term. Countercl. ¶ 60. It was also understood between Ms. Hammer and Mr. LaPierre that the NRA would not terminate her "contracting agreement" and would pay to her all of the amounts provided for therein. *Id*. Using a contracting agreement with the NRA as the vehicle for Ms. Hammer to receive income from the NRA in exchange for nothing would permit money to flow from the NRA to Ms. Hammer with no one at the organization, outside of Ms. Hammer and Mr. LaPierre, being the wiser to the arrangement. Countercl. ¶ 61.

Both Ms. Hammer and Mr. LaPierre knew that anyone at the NRA reviewing this final "contracting agreement" would rely upon the false statements and representations therein when determining to ratify the same, as had been done previously for Ms. Hammer's prior contracting agreements between 2004 and 2017. Countercl. ¶¶ 32, 62.

In furtherance of their scheme, Mr. LaPierre and Ms. Hammer negotiated the terms of Ms. Hammer's 2018 Contracting Agreement, executing the same on December 22, 2017. Countercl. ¶¶ 35, 63; Ex. 11. Mr. LaPierre breached the NRA's procedure for executing service contracts with persons outside the NRA, especially those involving self-dealing by an interested party to the transaction, by not receiving the requisite prior approval from the NRA's Audit Committee, indicating the improper purpose of Ms. Hammer's 2018 Contracting Agreement. Countercl. ¶¶ 70-72.

Mr. LaPierre and Ms. Hammer also negotiated an Addendum to Ms. Hammer's 2018 Contracting Agreement, extending the term of the agreement and increasing Ms. Hammer's contractor fee, Countercl. ¶¶ 44, 46, 47, once again doing so without receiving the requisite prior approval from the NRA's Audit Committee, Countercl. ¶ 72. The NRA's Audit Committee did not review or ratify either Ms. Hammer's 2018 Contracting Agreement or the Addendum until long *after* the documents were already executed by Ms. Hammer and Mr. LaPierre. Countercl. ¶ 73.

When the 2018 Contracting Agreement and the Addendum were finally presented to the NRA's Audit Committee for review and ratification several months after the fact, Ms. Hammer and Mr. LaPierre falsely represented to the NRA by their statements in the 2018 Contracting Agreement and by their signatures on both the 2018 Contracting Agreement and the Addendum that (1) Ms. Hammer would continue providing consulting services to the organization, as she had done under her previous Contracting Agreements from 2004 to 2017; (2) the services Ms. Hammer would provide were of unique character and value to the NRA; (3) the compensation and duration of Ms. Hammer's agreement were fair and reasonable; and (4) ratifying the 2018 Contracting Agreement and Addendum were in the best interests of the NRA. Countercl. ¶ 74. The NRA's Audit Committee relied on the representations made in the 2018 Contracting Agreement and Addendum when deciding to ratify the same. Countercl. ¶ 76.

Had the NRA's Audit Committee known the true purpose of Ms. Hammer's 2018 Contracting Agreement and the Addendum, the NRA's Audit Committee would not have ratified either the 2018 Contracting Agreement or the Addendum. Countercl. ¶ 78. As fiduciaries of the Organization, both Ms. Hammer and Mr. LaPierre had a duty to inform the NRA's Audit Committee of the true purpose of Ms. Hammer's 2018 Contracting Agreement and the Addendum

8

but did not do so, Countercl. ¶¶ 79-80, concealing this information from the NRA, Countercl. ¶ 81.

Between January 1, 2018, and April 22, 2024, Ms. Hammer received approximately $1,419,000.00 in payments from the NRA under the 2018 Contracting Agreement and Addendum while providing nothing to the organization in return. Countercl. ¶ 85.

The NRA's investigation into Ms. Hammer's actions remains ongoing. Countercl. ¶ 86.

## III.     Legal Standard

Rule 12(b)(6) motions "do[] not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id*.; *accord* Dkt. No. 29 at 3-4 (arguing that the parties cannot introduce differing facts in a Rule 12(b)(6) motion to dismiss, and the Court cannot resolve those factual disputes, which is "clear, black letter law as taught in first-year civil procedure.").

To survive a motion to dismiss, a complaint need only include sufficient factual allegations such that, if accepted as true, the complaint would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "This analysis is context-specific and requires 'the reviewing court to draw on its judicial experience and common sense.'" *Cook v. VA Powhatan 60,* LLC, No. 3:24-cv-434, 2025 U.S. Dist. LEXIS 10609, at *5 (E.D. Va. Jan. 21, 2025) (quoting *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)). A facially plausible claim should survive a Rule 12(b)(6) motion to dismiss "even if it appears that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citation and internal quotation marks omitted).

"Pursuant to Rule 9(b), certain elements of a fraud claim are subject to a 'heightened pleading standard.'" *Concord Crossroads, LLC v. Human Capital Res. & Concepts, Inc.*, No. 1:20-cv-00589 (RDA/IDD), 2021 U.S. Dist. LEXIS 110245, at *11 (E.D. Va. June 10, 2021) (citation omitted). When "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* (quoting Fed. R. Civ. P. 9(b)).

## IV.    Argument

In her Motion, Ms. Hammer asks the Court to dismiss Counts IV (Virginia Business Conspiracy Act), V (Virginia Common Law Conspiracy), and VII (Fraud in the Inducement) of the NRA's First Amended Counterclaims for failure to state a claim. *See* Mot. As detailed below, Ms. Hammer's Motion fails to establish that Counts IV, V, and VII are subject to dismissal. The Court should deny the Motion in its entirety.

### A.    The NRA States Claims of Civil Conspiracy Under Virginia Law

In Counts IV and V, the NRA brings claims for civil conspiracy against Ms. Hammer under the Virginia Business Conspiracy Act, Countercl. ¶¶ 118-30 (Count IV), and Virginia common law, Countercl. ¶¶ 131-43 (Count V). Because these claims both concern civil conspiracy and share common facts, the NRA will analyze them together. As explained below, the NRA states actionable claims for civil conspiracy against Ms. Hammer under Virginia law.

#### 1.    The NRA States a Claim Under Virginia's Business Conspiracy Act

The Business Conspiracy Act, Va. Code §§ 18.2-499, 500, imposes liability on those who "willfully and maliciously injure . . . another in his reputation, trade, business, or profession by any means whatever." Va. Code § 18.2-499(A). To state a claim under the Business Conspiracy Act, the NRA need only allege "(1) a combination of two or more persons for the purpose of

10

willfully and maliciously injuring [the NRA] in his business; and (2) resulting damage to [the NRA]." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014). It is unnecessary for the NRA to allege that the conspirators acted with actual malice, only legal malice (i.e., acting intentionally, purposely, and without lawful justification). *Id*. at 215. The NRA states a claim under the Business Conspiracy Act if it sets forth the core facts supporting the claim. *E.g., Primus Telecomms., Inc. v. Toshiba of Eur. Ltd.*, No. 1:09-cv-10, 2009 U.S. Dist. LEXIS 104207, at *12-14 (E.D. Va. Aug. 21, 2009).

Ms. Hammer advances three arguments for dismissal: (1) the NRA does not allege facts in the Amended Counterclaim to show that Ms. Hammer and Mr. LaPierre acted in concert to injure the NRA via Ms. Hammer's 2018 Contracting Agreement and the Addendum, *see* Mot. at 5-6; (2) the facts alleged "support[] the *opposite* notion[] that [Ms.] Hammer an [Mr.] LaPierre were *not* working in concert," *id*. (emphasis in original); and (3) the NRA's claim under the Business Conspiracy Act is barred by Virginia's intra-corporate immunity doctrine, Mot. at 7. Each of Ms. Hammer's arguments lacks merit and fails.

First, the NRA alleges in its Counterclaim that Ms. Hammer and Mr. LaPierre acted in concert together to injure the NRA in its business through the 2018 Contracting Agreement, and its subsequent Addendum, to create a means for Ms. Hammer to obtain significant sums of money from the NRA under the false pretense of performing "consulting services" that Ms. Hammer would not provide. Countercl. ¶¶ 54-85. The NRA *specifically alleges* that Ms. Hammer and Mr. LaPierre agreed to procure a continuous income stream for Ms. Hammer under the guise of a "contracting agreement" with the NRA because Ms. Hammer had previously entered into multiple contracting agreements with the NRA between 2004 and 2017 during Mr. LaPierre's tenure as the NRA's EVP. Countercl. ¶ 58. Ms. Hammer acknowledges in her Motion that an agreement between

11

two persons to injure another in their business or trade, which causes injury in fact, creates an actionable claim under the Business Conspiracy Act. Mot. at 5 ("It is not enough to show that the actions of two or more persons caused injury to another person, the persons must have *agreed* to injure another.") (citing *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 327 (W.D. Va. 2007)) (emphasis added). Ms. Hammer's and Mr. LaPierre's actions were not independent of one another, but, rather, part of a concerted alleged scheme to defraud the NRA. Countercl. ¶¶ 54-85. The NRA details the scheme agreed to between Ms. Hammer and Mr. LaPierre to facilitate and procure an income stream for her from the NRA while she provided nothing in return. Countercl. ¶¶ 56-85. Virginia courts have reviewed similar Rule 12(b)(6) motions to dismiss under the Business Conspiracy Act have determined that allegations suggesting or establishing concerted action between two persons to injure another in their business, such as the NRA's here, state an actionable claim of civil conspiracy under the Act.[1]

Second, Ms. Hammer's argument that the NRA's allegations "support[] the *opposite* notion[] that [Ms.] Hammer an [Mr.] LaPierre were *not* working in concert," Mot. at 5, is a red-herring and seeks to contest the facts asserted in support of the NRA's claim on a motion to dismiss. *See Halscott*, 66 F.4th at 157 (Rule 12(b)(6) motions "do[] not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses"). Ms. Hammer's arguments over Mr.

---

[1]    *See, e.g., Primus*, 2009 U.S. Dist. LEXIS 104207, at *12-14 (allegations showing a conspiracy to fraudulently induce the plaintiff to enter into a contract that the defendants had no intention to perform is actionable under the Business Conspiracy Act); *Pre-Fab Steel Erectors, Inc. v. Stephens*, No. 6:08-cv-00039, 2009 U.S. Dist. LEXIS 26548, at *50 (W.D. Va. Apr. 1, 2009) (pleading concerted action between the defendants satisfies the pleading requirements under the Business Conspiracy Act); *Schlegel*, 505 F. Supp. 2d at 327 (Business Conspiracy Act claim failed because the plaintiff "did not allege any concerted action [] or the existence of any preconceived plan"); *accord City of Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 447 (4th Cir. 1990) (holding that the plaintiffs stated a claim for fraud when they alleged that the defendants made promises to supply a certain type of pipe, with no intention to do so, and that these promises induced the plaintiff into entering into a contract).

LaPierre's state of mind during their conspiracy and who Mr. LaPierre was trying to benefit cannot be resolved on a motion to dismiss. *Mendoza v. Cederquist*, No. 1:09-cv-163 (LMB/IDD), 2009 U.S. Dist. LEXIS 38264, at \*11-12 (E.D. Va. May 6, 2009).

Third, Ms. Hammer's argument that the NRA's Business Conspiracy Act claim is barred by Virginia's intra-corporate immunity doctrine fails for multiple reasons, explained below.

Briefly, the intra-corporate immunity doctrine stands for the general proposition that "acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). This is because a single entity cannot legally conspire with itself. *Koontz v. Jording*, No. 3:18-cv-380, 2019 U.S. Dist. LEXIS 49776, at \*26 (E.D. Va. Mar. 25, 2019) (citation omitted). But there are multiple exceptions to this general rule. For example, the intra-corporate immunity doctrine does not apply where one of the parties to the conspiracy "acted outside the scope of their employment," *id*., or where one of the parties had "an independent personal stake" in the conspiracy separate from their relationship to the corporation, *ePlus Tech.*, 313 F.3d at 179. Furthermore, whether the intra-corporate immunity doctrine applies is an affirmative defense that cannot be resolved on a motion to dismiss unless *all facts* necessary to the defense "clearly appear on the face of the complaint." *Tavenner v. ULX Partners, LLC (In re Leclairryan PLLC)*, Nos. 19-34574, 20-03142, 2021 Bankr. LEXIS 1917, at \*3 n.3 (Bankr. E.D. Va. July 20, 2021) (quoting *Goodman v. Praxair, Inc*., 494 F.3d 458, 464 (4th Cir. 2007)).

Here, Ms. Hammer argues that the intra-corporate immunity doctrine applies and ultimately bars the NRA's Business Conspiracy Act claim because, according to her, "[t]he NRA cannot claim that [Mr.] LaPierre was acting outside of the scope of his employment when his actions were subsequently authorized by his principal, the NRA." Mot. at 7. Setting aside the fact

13

that (1) whether or not Mr. LaPierre was acting within the scope of his employment as the NRA's EVP is a question of fact that cannot be resolved on a motion to dismiss, *e.g., Williams v. Autozone Stores, Inc.*, No. 3:09-cv-255, 2009 U.S. Dist. LEXIS 106327, at *6-7 (E.D. Va. Nov. 13, 2009), and (2) all of the facts necessary to determine whether Mr. LaPierre was acting within the scope of his employment are not contained in the NRA's Amended Counterclaims, *Tavenner*, 2021 Bankr. LEXIS 1917, at *3 n.3, the intra-corporate immunity doctrine does not apply in this case as a matter of law.

Ms. Hammer was not an "agent" of the NRA by virtue of her membership on its Board, which she incorrectly assumes in her Motion. *Monacan Hills, Inc. v. Page*, 203 Va. 110, 116 (1961) ("[D]irectors of a corporation have authority to bind it only when they act collectively as a board. Individual directors are not its agents[.]"); *accord Zornoza v. Terraform Glob., Inc.*, 419 F. Supp. 3d 715, 734 (S.D.N.Y. 2019) ("Neither the board of directors nor an individual director of a business is, as such, an agent of the corporation or of its members."). Moreover, Ms. Hammer had an indisputable personal stake in the conspiracy to obtain the 2018 Contracting Agreement separate from her membership on the NRA's Board. Countercl. ¶ 55; *ePlus Tech.*, 313 F.3d at 179. The intra-corporate immunity doctrine does not apply and is not an available affirmative defense to Ms. Hammer.

The NRA alleges facts that create a plausible inference that Ms. Hammer and Mr. LaPierre violated Virginia's Business Conspiracy Act through their concerted conspiracy to fraudulently induce the NRA to enter into the 2018 Contracting Agreement and ratify the Addendum. The Court should deny Ms. Hammer's Motion to Dismiss Count IV.

14

### 2.      The NRA States a Claim of Common Law Conspiracy

In Virginia, "[a] common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means resulting in damages to the plaintiff caused by the acts committed in furtherance of the conspiracy[.]" *Dogs Deserve Better, Inc. v. Terry*, No. 3:14-cv-591, 2015 U.S. Dist. LEXIS 35140, at *8 (E.D. Va. Mar. 20, 2015) (citations omitted). All the NRA needs to allege is that Ms. Hammer and Mr. LaPierre "combined together to effect a preconceived plan and unity of design and purpose." *Moschetti v. Nixon Peabody, LLP*, No. 3:23-cv-389, 2024 U.S. Dist. LEXIS 95757, at *36 (E.D. Va. May 29, 2024) (citation and internal quotation marks omitted).

In her Motion, Ms. Hammer reasserts the same arguments about the purported sufficiency of the NRA's Business Conspiracy Act claim to support dismissal of its common law conspiracy claim. Mot. at 8. Ms. Hammer also renews the argument from her original motion to dismiss that the NRA's conspiracy claim fails because "it alleges no value gained by [Mr.] LaPierre or motive for his 'fraud." *Id.*

As discussed above, the NRA has plausibly alleged facts stating a claim under Virginia's Business Conspiracy Statute, and those same facts support a claim for common law civil conspiracy, which do not warrant repeating here. Countercl. ¶¶ 54-85; *accord Dogs Deserve Better*, 2015 U.S. Dist. LEXIS 35140, at *8-10 (allegations sufficient to establish a violation of the Business Conspiracy Act also support a common law conspiracy claim). And Ms. Hammer's continued "no benefit to LaPierre" argument remains the same red herring it was in her initial motion to dismiss. Ms. Hammer, once again, fails to cite to any legal authority holding that each participant to a conspiracy in Virginia must benefit from it, Mot. at 8, and undersigned remains

15

unaware of any such legal authority. Whether or not Mr. LaPierre benefitted from the alleged conspiracy is irrelevant. *E.g., Dogs Deserve Better*, 2015 U.S. Dist. LEXIS 35140, at \*8.

The NRA has sufficiently alleged a claim of common law conspiracy under Virginia law. The Court should deny Ms. Hammer's Motion to Dismiss Count V.

### B. The NRA States a Claim for Fraud in the Inducement

In Count VII, the NRA brings a claim for fraud in the inducement against Ms. Hammer for her part in conspiring with Mr. LaPierre to induce the NRA to enter into the 2018 Contracting Agreement and ratify the subsequent Addendum. *See* Countercl. ¶¶ 155-75.

To state a claim for fraud in the inducement under Virginia law, the NRA is required to allege facts suggesting that Ms. Hammer (1) falsely represented a material fact (2) for the purpose of procuring the 2018 Contracting Agreement and Addendum, and that the NRA (3) relied on that representation and (4) was induced by it to enter the 2018 Contracting Agreement and ratify the Addendum. *See Mendoza,* 2009 U.S. Dist. LEXIS 38264, at \*12-13. Fraud exists in the contractual setting when the defendant harbored an intent not to perform the contract at the time of contracting. *Supervalu, Inc. v. Johnson*, 276 Va. 356, 368 (Va. 2008) ("[I]f a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud."). Ms. Hammer's intentions (i.e., her state of mind) with respect to the 2018 Contracting Agreement "is a matter of fact." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 537 (4th Cir. 1988).

Ms. Hammer presents one main argument[2] for dismissal of the NRA's amended fraud in the inducement claim: the NRA purportedly only alleges that "[Ms.] Hammer and [Mr.] LaPierre

---

[2] Ms. Hammer also reasserts her red herring argument that the NRA "does not explain why its own official [Mr. LaPierre] was allegedly negotiating against it, while receiving no benefit for

16

negotiated an agreement that said [Ms.] Hammer would perform work, while intending a reality in which [Ms.] Hammer would not perform work," which Ms. Hammer argues is insufficient. *See* Mot. at 9. Ms. Hammer mischaracterizes the content of the NRA's allegations supporting its fraudulent inducement claim. *Compare* Mot. at 9 *with* Countercl. ¶¶ 54-85, 155-75. Regardless, Ms. Hammer's argument fails because the NRA has alleged facts creating the plausible inference that Ms. Hammer made materially false representations of her intent to perform under the 2018 Contracting Agreement, at the time of contracting, to induce the NRA's Audit Committee to ratify the same and suffer injury, stating a claim for fraud in the inducement under Virginia law. *E.g. Viano v. THD At-Home Servs.*, No. 1:19-cv-1272 (TSE), 2020 U.S. Dist. LEXIS 62990, at *14 (E.D. Va. Apr. 9, 2020); *Concord*, 2021 U.S. Dist. LEXIS 110245, at *18-19.

Here, the NRA alleges that Ms. Hammer, in concert with Mr. LaPierre, made affirmative false statements to the NRA in the 2018 Contracting Agreement concerning Ms. Hammer's intent to perform under the terms of the agreement. Countercl. ¶¶ 55-58, 60, 64, 67-69, 74-75. Namely, that Ms. Hammer would provide "consulting services" to the NRA that the NRA could not obtain elsewhere. Countercl. ¶ 74. The NRA is permitted to allege Ms. Hammer's intention not to perform generally. *Concord*, 2021 U.S. Dist. LEXIS 110245, at *11 (quoting Fed. R. Civ. P. 9(b). And despite the 2018 Contracting Agreement containing all of the same terms and affirmative representations in Ms. Hammer's previous Contracting Agreements with the NRA between 2004-2017, the purpose of the 2018 Contracting Agreement was not for Ms. Hammer to provide any "services" to the NRA but a source of income to support her retirement while she provided nothing to the Organization in return. Countercl. ¶¶ 54-55, 57, 60, 67, 75, 85, 160, 162-63, 167. Ms.

---

himself." Mot. at 9. But as the NRA has already discussed above, this line of argument is unsupported by any cognizable Virginia authority and lacks merit.

Hammer did not, in fact, provide any "services" to the NRA under the 2018 Contracting Agreement despite receiving payment in-full from the NRA. Countercl. ¶¶ 54, 85, 172. These allegations, taken together as true with all reasonable inferences drawn in the NRA's favor, plausibly establish that Ms. Hammer falsely represented a material fact to the NRA for the purpose of procuring the 2018 Contracting Agreement, the Addendum, and the payments made to her thereunder. *See Weiler v. Arrowpoint Corp.*, No. 1:10-cv-157 (TSE), 2010 U.S. Dist. LEXIS 46163, at *15-16 (E.D. Va. May 11, 2010) ("[T]he fact that [the defendant] did not make a single payment on the note until December 2009 suggests the possibility of 'prompt, substantial nonperformance' that supports the inference that [the defendant] never intended to perform.") (citation omitted).

The NRA then alleges that its Audit Committee reasonably relied upon Ms. Hammer's representations in the 2018 Contracting Agreement and Addendum when deciding to ratify the same. Countercl. ¶¶ 76, 169-70. Had the Audit Committee known that Ms. Hammer did not intend to provide the Organization with any "services" under the 2018 Contracting Agreement but was using the agreement to obtain a source of income to subsidize her retirement, the NRA's Audit Committee would not have ratified either the 2018 Contracting Agreement or its Addendum. Countercl. ¶¶ 78, 171. The NRA was damaged by paying $1,419,000.00 to Ms. Hammer for consulting services that she did not provide to the organization nor intended to provide. Countercl. ¶¶ 85, 172-73. Ms. Hammer does not contest the adequacy of these allegations. Mot. at 9.

Courts in the Eastern District of Virginia to review fraud in the inducement claims supported by allegations similar to those made by the NRA have determined that those claims met the requisite pleading standard under the Federal Rules. *E.g. Viano*, 2020 U.S. Dist. LEXIS 62990, at *14; *Concord*, 2021 U.S. Dist. LEXIS 110245, at *18-19; *Weiler*, 2010 U.S. Dist. LEXIS 46163, at *15-16. Accordingly, the NRA alleges facts sufficient to establish a plausible inference that Ms.

Hammer fraudulently induced the NRA to entered into the 2018 Contracting Agreement and ratify the Addendum. The Court should deny Ms. Hammer's Motion to Dismiss Count VII.

## V.        Conclusion

For all these reasons, the NRA respectfully requests that the Court deny Ms. Hammer's Motion to Dismiss Counts IV, V, and VII of the Amended Counterclaims in its entirety.

Respectfully submitted,

**JACKSON LEWIS P.C.**

Dated: March 12, 2026            By:      /s/ *Nigel L. Wilkinson*
Jeremy S. Schneider (VSB No. 84419)
Nigel L. Wilkinson (VSB No. 46500)
11790 Sunrise Valley Drive, Suite 400
Reston, Virginia 20191
(703) 483-8300 (Tele.)
(703) 483-8301 (Fax)
jeremy.schneider@jacksonlewis.com
nigel.wilkinson@jacksonlewis.com

*Counsel for Defendant The National Rifle Association of America*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 12, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF electronic filing system, which will send a notification of such filing to the following counsel of record:

John C. Cook, Esq. (VSB No. 38310)
Cook Legal Solutions
3975 University Drive, Suite 360
Fairfax, Virginia 22030
(703) 537-0023 (Tele.)
(571) 520-9836 (Fax)
jcook@cooklegalsolutions.com

Richard Earl Coates
Coates Law Firm, PL
115 East Park Avenue, Unit 1
Tallahassee, Fl 32301
(850) 681-1029 (Tele.)
rcoates@rcoateslaw.com

*Counsel for Plaintiff Marion P. Hammer*

By:  /s/ *Nigel L. Wilkinson*
Nigel L. Wilkinson (VSB No. 46500)
JACKSON LEWIS P.C.
11790 Sunrise Valley Drive, Suite 400
Reston, Virginia 20191
(703) 483-8300 (Tele.)
(703) 483-8301 (Fax)
jeremy.schneider@jacksonlewis.com

*Counsel for Defendant The National Rifle Association of America*

20